# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### STATESBORO DIVISION

RYAN PATRIC THOMAS,

       Plaintiff,

   v.

CO LT. JOSEPH HUTCHESON; CO II
LEROY KUBACHI; CO II ALMA BROWN;
and CO I ANTONIO MCCLOUD,

       Defendants.

CIVIL ACTION NO.: 6:14-cv-16

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently housed at Georgia State Prison in Reidsville, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement. (Doc. 1.) Defendants Joseph Hutcheson, Leroy Kubacki, Alma Brown, and Antonio McCleod (collectively, "Defendants") filed a Motion for Summary Judgment. (Doc. 52.)[1] Plaintiff filed a Response, (doc. 55), and Defendants filed a Reply (doc. 58).

The Court issued a Report and Recommendation on Defendant's Motion on June 29, 2015. (Doc. 64.) Though the body of that Report and Recommendation made clear that the undersigned recommended that Defendants' Motion be granted in part and denied in part, the first paragraph of the Motion erroneously indicated that the Motion should be wholly granted. In order to clarify any confusion caused by this error, the undersigned hereby **WITHDRAWS** the

---

[1] Defendants Kubacki and McLeod identify themselves in their sworn Declarations as "Leroy Kubacki" and "Antonio McLeod" but were named as "Kubachi" and "McCloud," respectively, in the Complaint and, thus, on the docket of this case. (Docs. 52-6, 52-8.) The Clerk of Court is hereby **DIRECTED** to correct the docket of this case to name these Defendants as "Leroy Kubacki" and "Antonio McLeod."

Order and Report and Recommendation issued on June 29, 2015 (doc. 64) and issues the below Order and Recommendation in its place.[2]

For the reasons that follow, Defendants' Motion should be **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment as to Defendants Brown and McLeod should be **GRANTED**, and all claims against those Defendants should be **DISMISSED WITH PREJUDICE**.

Defendants' Motion for Summary Judgment as to Defendants Kubacki and Hutcheson should be **DENIED**, and all claims against those Defendants should remain pending. Likewise, as to Defendants Kubacki and Hutcheson, Defendants' Motion for Summary Judgment based on qualified immunity, de miminis physical injury under the PLRA, and claims for injunctive relief should be **DENIED**. Defendants' Motion for Summary Judgment as to claims based on vicarious or supervisory liability and claims for money damages against Defendants in their official capacities should be **DENIED AS MOOT**.

The prior Report and Recommendation having been withdrawn, the parties are relieved of any obligation to file objections that Report and Recommendation. The parties are **ORDERED** to file any Objections to this Report and Recommendation within fourteen (14) days from the date of its issuance. However, Plaintiff having already filed partial objections (doc. 65), to the earlier Report and Recommendation, he need not reassert those objections.

## BACKGROUND

This case revolves around Defendant Kubacki's use of force against Plaintiff on December 27, 2012, at Georgia State Prison ("GSP"). (Doc. 1.) On that date, Plaintiff was housed in the K1 Building of GSP, which is a "lockdown unit" where inmates are housed in

---

[2]   Other than correcting the error in the introduction to the earlier Report and Recommendation, this Report and Recommendation is identical in all other respects.

single-man cells and remain in those cells except when being escorted by an officer. (Doc. 52-1, p. 3.) Inmates in the K1 Building are given one hour per day out of their cells for yard time. (Id.) Plaintiff claims that prior to leaving the yard on December 27, 2012, he informed Defendant Hutcheson that Defendant Kubacki had been threatening to harm Plaintiff physically. (Doc. 1, p. 5.) Defendants Hutcheson, Kubacki, Brown, and McLeod then escorted Plaintiff from the yard to his cell. (Doc. 52-1, p. 3.) Once in the hallway outside of Plaintiff's cell and while all Defendants were still present, Defendant Kubacki used force against Plaintiff to bring him against the wall and eventually to the ground. (Id. at pp. 3–4.) Plaintiff maintains that this use of force was unwarranted and excessive (doc. 1, p. 6), while Defendants maintain that Defendant Kubacki only employed the amount of force necessary to address Plaintiff's noncompliance with an order (doc. 52-2, p. 8). Plaintiff pursued claims of excessive force through GSP's grievance process and then filed this lawsuit on March 10, 2014. (Doc. 1, pp. 1, 3–4.)

After the requisite frivolity review, Plaintiff's Complaint was served against Defendants based on Plaintiff's assertions that Defendant Kubacki used an excessive amount of force against Plaintiff, and that Defendants Hutcheson, Brown, and McLeod failed to intervene on Plaintiff's behalf. (Doc. 12.) After a period of discovery, these Defendants moved for summary judgment on all claims against them. (Doc. 52.) Defendants and Plaintiff have filed materials, respectively, in support of and in opposition to Defendants' Motion. (Docs. 52, 55, 58–60.) In these materials, Defendants and Plaintiff give conflicting accounts of the events of December 27, 2012. (Docs. 52, 55, 58–60.)

In his Declaration offered in support of the Motion, Defendant Hutcheson states that he was the officer in charge on the date of the incident. (Doc. 52-4, p. 3.) He states that he does not

recall having any conversation with Plaintiff while Plaintiff was in the recreation yard. (Id.) Defendant Hutcheson does affirm that he and Defendants Kubacki, Brown, and McLeod escorted Plaintiff from the recreation yard to Plaintiff's cell in the K1 Building. (Id. at pp. 5–6.)

Defendants Hutcheson, Kubacki, and McLeod declare that once they arrived at Plaintiff's cell, Plaintiff moved toward the neighboring cell and that Plaintiff placed his head against the window flap of that cell. (Id. at p. 4; Doc. 52-6, p. 4; Doc. 52-8, p. 4.) Defendant Kubacki states that he gave Plaintiff an order to stop being disruptive and then placed his hands on Plaintiff's handcuffs in an attempt to gain positive control of Plaintiff, but Plaintiff snatched away from him and tried to strike Defendant Kubacki with his left elbow. (Doc. 52-6, p. 4.) According to Defendants Hutcheson, Kubacki, and McLeod, Defendant Kubacki secured Plaintiff along the wall, and Plaintiff continued resisting Defendant Kubacki's efforts to control him, so Defendant Kubacki took Plaintiff down to the floor. (Doc. 52-4, p. 4; Doc. 52-6, p. 4; Doc. 52-8, p. 4.)[3] Defendants Kubacki and McLeod claim that Plaintiff also tried to spit at Defendant Kubacki. (Doc. 52-6, p. 4; Doc. 52-8, p. 4.) Once Plaintiff was on the ground, Defendant Kubacki states that he placed his right hand on Plaintiff's head to prevent him from spitting at him. (Doc. 52-6, p. 5.) Defendants Hutcheson, Kubacki, and McLeod maintain that Defendant Kubacki did not slam Plaintiff's face into a doorjamb, did not strike Plaintiff in any manner, and did not grind Plaintiff's face into the concrete. (Doc. 52-4, p. 4; Doc. 52-6, p. 5; Doc. 52-8, pp. 4–5.)

In contrast, Plaintiff declares that on the date of the incident, he refused to come out of the yard because he wanted to talk with Defendant Hutcheson, the officer in charge, about threats that Defendant Kubacki had made toward Plaintiff "regarding bodily harm." (Doc. 55-3, p. 1.)

---

[3] Defendant Brown declares that she had briefly turned her back to Plaintiff and Defendants Hutcheson, Kubacki, and McLeod, and when she turned back to face them, saw Plaintiff and Defendant Kubacki on the floor. (Doc. 52-7, p. 4.) Defendant Brown also states that she did not see Defendant Kubacki use any force against Plaintiff. (Id.)

Plaintiff states that he and Defendant Kubacki had an argument the day before and that Defendant Kubacki stated that he was going to "get at" Plaintiff. (Id.) Plaintiff states that after he relayed these concerns, Defendant Hutcheson replied that Plaintiff was "snitching" and asked Plaintiff, "You coming off the yard or not because either way something going to happen to you." (Id.)

Plaintiff states that after Plaintiff was escorted to his cell, Defendant Kubacki did not give Plaintiff a direct order to do anything before using excessive force against him. (Doc. 55, p. 28.)[4] Plaintiff declared that he could not enter his cell, because his cell door was not yet open. (Doc. 55-3, p. 1.) Plaintiff also states that he did not attempt to snatch away from Defendant Kubacki and that he did not attempt to spit at Defendant Kubacki. (Id. at pp. 1–2.) Plaintiff admits that he placed his head on the window flap of the cell next to his, but he states that it was because he was trying to talk to the person in that cell who had warned him to "watch out." (Id. at p. 1.) Plaintiff states that Defendant Kubacki grabbed Plaintiff's handcuffs with one hand and, with the other hand, rammed Plaintiff's face and the top of Plaintiff's head into the doorjamb. (Id. at p. 2.) Plaintiff states that Defendnt Kubacki then struck Plaintiff with a closed fist twice on the right side of his head. (Id.) Plaintiff also states that Defendant Kubacki, with a downward thrusting motion and with a "large amount of force," came down on Plaintiff's shoulder and collarbone two or three times. (Id.) According to Plaintiff, Defendant Kubacki then grabbed Plaintiff's right shoulder and collarbone area and put his weight on Plaintiff until he collapsed. (Id.) Plaintiff avers that once he was on the ground, Defendant Kubacki fell on Plaintiff in a way

---

[4] Plaintiff's deposition testimony is consistent with the statements he made in his sworn Declarations and, therefore, need not be recounted. (Doc. 52-3, pp. 14–18.)

suggesting that he was trying to hurt Plaintiff. (Id.)[5] Plaintiff states that Defendant Kubacki then

hit him in his left eye with a fist and placed his hand on top of Plaintiff's head, which caused the

right side of Plaintiff's face to be ground into the concrete floor. (Id.)

Defendants also submitted a DVD containing surveillance footage from the stationary

video camera in the K1 Building as well as two DVDs containing footage from handheld video

cameras used during Plaintiff's escort to the medical unit after this use-of-force incident. (Docs.

52-12, 52-13, 52-14.) The footage from the surveillance camera in the K1 building is not of the

best quality and has no audio. In addition, Defendant Kubacki's use of force against Plaintiff

occurred a considerable distance from the surveillance camera and can only be seen through a

window pane. However, the Court is able to detect Plaintiff, who was dressed in his white prison

uniform, and Defendant Kubacki, who was dressed in his corrections officer uniform and

noticeably larger than the other people depicted in this footage. From the footage, the Court can

detect some but not all of Plaintiff and Defendant Kubacki's movements.

This surveillance camera footage reveals the following events. Plaintiff was being

escorted to his cell by Defendant Brown, who was holding Plaintiff's handcuffs, and Defendants

Hutcheson, McLeod, and Kubacki, who were following behind Plaintiff and Defendant Brown.

(Doc. 52-12, 33:00.) Once Plaintiff and Defendants approached Plaintiff's cell, Plaintiff lowered

his head and stepped to his left toward the cell next to his. (Id. at 33:17.) Plaintiff then moved

the left side of his body. (Id. at 33:19.) Defendant Kubacki grabbed Plaintiff's handcuffs and

knocked Plaintiff into the wall twice before bringing Plaintiff to the ground. (Id. at 33:20–24.)

Directly after bringing Plaintiff to the ground, Defendant Kubacki was on top of Plaintiff for

---

[5]  It is evident from the surveillance footage that there is a disparity in size between Plaintiff and
Defendant Kubacki. Plaintiff maintains that he is five feet five inches tall and weighs 138 pounds.
(Doc. 1, p. 6.) Defendant Kubacki admits that he is six feet four inches tall and weighs approximately
415 pounds. (Doc. 55-4, p. 37.)

approximately five seconds.  (Id. at 33:23–28.)  Defendant Kubacki then stood up and knelt beside Plaintiff with his hands still on Plaintiff.  (Id. at 33:40–41.)  The period from the time Defendant Kubacki knocked Plaintiff into the wall to the time he knelt beside Plaintiff lasted approximately twenty seconds.  The video does not directly show Defendant Kubacki punching Plaintiff; however, again, the video is not very clear, and not all of the parties' movements are decipherable.

Approximately a minute after Defendant Kubacki brought Plaintiff to the ground, two other officers appeared on camera to assist with Plaintiff's escort to the medical unit.  (Id. at 34:15.)  Plaintiff was brought to his feet and escorted to the medical unit (id. at 35:26), while two handheld cameras captured the walk to medical, the audio from Plaintiff's medical examination, and Plaintiff's return to his cell (docs. 52-13, 52-14).

The video footage upon Plaintiff's arrival to medical reveals that Plaintiff had marks on the right side of his face around his eye, some marks on the right side of his neck around his collar, and some swelling to the left side of his face.  (Doc. 52-13, 4:34–5:13.) [6]  The still photographs and medical examination forms that the parties submitted reveal that Plaintiff had several small abrasions to the right side of his face and shoulder area and a small laceration on the top of his head.  (Doc. 52-11; Doc. 55-4, pp. 4–9; Doc. 52-10, p. 10.)  In addition, Rhonda Pickett, a licensed practical nurse, declared that she assisted with Plaintiff's medical examination on December 27, 2012.  (Doc. 52-9, p. 3.)  According to Nurse Pickett, Plaintiff's injuries consisted of "a hematoma to the left side of his scalp and abrasions to [the] right side of his neck[,] right side of his forehead[, and] . . . right side of his chest."  (Id.)

---

[6]  Per Georgia Department of Corrections' policy, a camera is not allowed to record video of an inmate's medical examination and may only be used to record the audio portions of the examination.  (Doc. 52-5, p. 14.)  A handheld camera was directed toward Plaintiff's face for about forty seconds' time before the medical examination began, at which time the camera was pointed at the ground.

In addition to the injuries depicted by the video footage and still photographs and noted by Nurse Pickett, Plaintiff contends that he suffered a "swelled and bruised left eye and cheek bone" and "later bruising on the right side of his forehead." (Doc. 55-1, p. 4.) Additionally, Plaintiff claims that the injuries to the top of his head later resulted in dizziness, vomiting, swelling, and bruising. (Id.) Plaintiff contends that he suffered lasting pain in his neck, back, and collarbone area. (Id.)

## DISCUSSION

Defendants set forth several grounds for summary judgment in their Motion. First, Defendants assert that the undisputed facts demonstrate that Defendant Kubacki did not use an excessive amount of force against Plaintiff. (Doc. 52-2, pp. 5–8.) Defendants also claim that Plaintiff cannot show that Defendants Hutcheson, Brown, and McLeod had a sufficient opportunity to intervene in any alleged excessive use of force. (Id. at pp. 8–9.) Defendants further claim that they are entitled to qualified immunity. (Id. at pp. 11–13.) Defendants argue that Plaintiff cannot sustain any respondeat superior claims against Defendants Hutcheson, Brown, and McLeod or monetary damages claims against any of the Defendants in their official capacities. (Id. at pp. 9–11.) Defendants assert that Plaintiff's monetary damages claims are barred because he cannot show any more than a de minimis physical injury. (Id. at pp. 13–14.) Finally, Defendants maintain that Plaintiff cannot sustain his claims for injunctive relief. (Id. at pp. 14–15.)

## I.    Standard of Review

Summary judgment "shall" be granted if "the movant[s] show[ ] that there is no genuine dispute as to any material fact and that the movant[s are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  However, there must exist a conflict in substantial evidence to pose a jury question."  Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving parties bear the burden of establishing that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving parties must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant[s are] entitled to judgment as a matter of law." See Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).

## II.     Eighth Amendment Claims

### A.     Use of Excessive Force

Plaintiff's excessive force claim and Defendants' Motion require analysis of the Eighth Amendment's proscription against cruel and unusual punishment. That proscription governs the amount of force that prison officials are entitled to use against inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994).[7] In order to satisfy the objective component, the inmate must show that the prison official's conduct was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The subjective component requires a showing that the force used was "maliciously and sadistically for the very purpose of causing harm" rather than "a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320–21 (1986). In order to determine whether the force was used for the malicious and sadistic purpose of causing harm or whether the force was applied in good faith, courts consider the following factors: the need for the exercise of force, the relationship between the need for force and the force applied, the extent of injury that the inmate suffered, the extent of the threat to the safety of staff and other inmates, and any efforts taken to temper the severity of a forceful response. Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs, 456 F. App'x 845, 848 (11th Cir. 2012) (quoting Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009)).

---

[7] The Court is aware that the Supreme Court recently held that analysis of excessive force claims brought by pretrial detainees only involves an objective standard. Kingsley v. Hendrickson, No. 14-6368, 2015 WL 2473447, at *8 (U.S. June 22, 2015). However, the Court distinguished that analysis, proceeding under the Fourteenth Amendment's Due Process Clause applicable to pretrial detainees, from the analysis under the Eighth Amendment's Cruel and Unusual Punishment Clause applicable to convicted prisoners such as Plaintiff. Id.

In this case and at this stage, there are too many controverted material facts for the Court to find that Defendant Kubacki did not use excessive force against Plaintiff. While the surveillance video footage sheds some light on this incident, it does not give a clear enough picture to resolve the factual disputes surrounding Defendant Kubacki's use of force. "In the context of cases involving video evidence, this Court will accept the video's depiction over the opposing party's account of the facts where the video obviously contradicts that version of the facts" such that no reasonably jury could believe them. Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. 2011). However, "even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events." Id.; see also Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315–16, 1316 n.2 (11th Cir. 2010) (Court declined to rely on video evidence to discredit plaintiff's version of events entirely, because the video lacked sound and was periodically obstructed). Such is the case here. The surveillance video was shot without sound, from a considerable distance, and through a window pane. While some of the parties' movements can be seen, much of the critical physical exchange between Plaintiff and Defendant Kubacki is obstructed or indecipherable.

The video evidence simply does not so blatantly contradict Plaintiff's version of events to discount his claim of excessive force. At this stage, it is not the Court's role to judge the credibility of Plaintiff's account versus Defendant's account. Rather, "the Court must adopt [Plaintiff's] version of the incident for purposes of summary judgment." Thwaites v. Wimbush, No. 5:11-CV-195 (CAR), 2013 WL 1333723, at *4 (M.D. Ga. Mar. 29, 2013). Furthermore, the factual disputes between Plaintiff's version of the incident and Defendants' account permeate

each of the factors that the Court takes into consideration when weighing an allegation of excessive force.

### 1. <u>The Need for the Exercise of Force</u>

For instance, as to the need for Defendant Kubacki to exercise force, Defendants argue that "[w]hen Kubacki attempted to restrain [Plaintiff], [Plaintiff] resisted, thus [Plaintiff] was taken to the floor."  (Doc. 52-2, p. 7.)[8]  However, while Plaintiff admits that he placed his head on the window of the cell next to his, he specifically disputes that he resisted Defendant Kubacki and states that Defendant Kubacki did not give him any order before using force against him.  (Doc. 55, p. 28; Doc. 55-3, p. 1.)  Likewise, though Defendant Kubacki maintains that Plaintiff attempted to hit Defendant Kubacki with his left elbow and spit on him, Plaintiff contends that he made no such efforts toward Defendant Kubacki or anyone else.  (Doc. 55-3, p. 1.)  While Defendants argue that Plaintiff violated a known procedure by failing to walk into his cell, Plaintiff contends that his cell door was not yet open and that he has never been instructed to stand by his cell and wait for the door to open.  (Doc. 55-2, p. 1.)  Construing these disputes in favor of Plaintiff, as the Court must at this stage, the jury could find that Plaintiff only placed his head on the window of the cell next to his without being instructed not to do so and, therefore, there was no need or only a minimal need for Defendant Kubacki to use force against Plaintiff.

### 2. <u>The Relationship Between the Need for the Use of Force and the Amount Applied</u>

There also are factual disputes as to the relationship between the need for the use of force and the amount of force applied by Defendant Kubacki.  Again, the issue of the need for the use

---

[8]  Defendants assert that Plaintiff was "unrestrained" in their Motion.  (Doc. 52-2, p. 7.)  This assertion appears to be a misstatement.  The balance of the parties' assertions and the evidence before the Court confirms that Plaintiff was handcuffed at the time of the incident.  While Defendant Brown may have released her grasp on Plaintiff's handcuffs, he remained handcuffed until after he was returned to his cell following his medical examination.

of force is unresolved due to the differences in Defendants' and Plaintiff's accounts of what occurred prior to Defendant Kubacki exercising force. Moreover, as laid out above, Defendants and Plaintiff also offer very different accounts of what occurred once Defendant Kubacki applied force. While Defendant Kubacki maintains that he merely secured Plaintiff against the wall and then brought him to the floor (doc. 52-6, p. 4), Plaintiff contends that Defendant Kubacki slammed Plaintiff's head and face against a doorjamb, punched Plaintiff, struck Plaintiff, brought his full bodyweight against Plaintiff once he was on the ground, and then ground Plaintiff's face into the floor (doc. 55-3, p. 1). Under Plaintiff's version of events, the jury could find that the force Defendant Kubacki applied far exceeded any need for force posed by Plaintiff.

### 3. The Extent of Injury to Plaintiff

The extent of Plaintiff's injury weighs more heavily in Defendant Kubacki's favor than the other factors. However, again, Plaintiff's injuries are not so clearly contradictory that they discredit Plaintiff's version of the incident. The extent of injury "is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied." Logan, 439 F. App'x at 800 (citing Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)). However, while the resulting injury can be indicative, the key inquiry is the amount of force applied by Defendant Kubacki, not the severity of the injury that resulted to Plaintiff. Id. at 800–01 (citing Wilkins, 559 U.S. at 37). Injury and force are "imperfectly correlated," and "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins, 559 U.S. at 38. As detailed above, according to Plaintiff and the medical evidence, he suffered a laceration and bruising to the top of his head; swelling and bruising to his left eye; and abrasions and swelling to his neck,

forehead, and chest.  (Doc. 52-9, p. 3; Doc. 52-10, p. 10; Doc. 52-11; Doc. 55-1, p. 4; Doc. 55-4, pp. 4–9.)  In addition, Plaintiff claims that the injuries to the top of his head later resulted in dizziness, vomiting, swelling, and bruising and that he suffered from lasting pain to his neck, back, and collarbone.  (Doc. 55-1, p. 4.)[9]  These injuries are not so insignificant that they would prevent the jury from finding for Plaintiff on the "core judicial inquiry," that being "the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'"  Wilkins, 559 U.S. at 39 (alteration in original) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).[10]

### 4.  <u>The Extent of the Threat to the Safety of Staff and Other Inmates</u>

Construing the facts in the light most favorable to Plaintiff, the jury could also find that Plaintiff posed little if any threat to the safety of staff and other inmates.  At the time that Defendant Kubacki used force against Plaintiff, Plaintiff's hands were in handcuffs behind his back, and he was surrounded by four correctional officers.  No other staff members or inmates were present in the hallway.

On this factor, Defendants cite the case of <u>Brown v. Smith</u>, wherein the Eleventh Circuit affirmed the grant of summary judgment to an officer who used force against an inmate to accomplish the "legitimate security purpose" of getting the inmate into his cell.  813 F.2d 1187, 1189–90 (11th Cir. 1987).  However, in <u>Brown</u>, it was undisputed that "upon returning from recreation, [the inmate] refused to enter his cell when ordered to do so" and that the inmate

---

[9]  Defendants dispute that Plaintiff suffered these residual effects of the incident and point out that he only requested medical treatment on one occasion after the incident.  (Doc. 52-1, p. 6.)  However, at this stage, where the objective evidence does not so clearly contradict and discredit Plaintiff's version of his injuries, the Court must accept his version.

[10]  As the Court noted in <u>Wilkins</u>, while the minor injuries Plaintiff suffered do not require a finding that the force used against him was not excessive, "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover."  559 U.S. at 40.

"resisted [the officer's] attempt to take his arm and lead him into the cell." Id. at 1189. In contrast, Plaintiff disputes that he refused to enter his cell or that he disobeyed an order or resisted an officer. (Doc. 55, p. 28; Doc. 55-3, p. 1.) He contends that his cell door was not opened, that no officer instructed him to stand in front of his cell, and that Defendant Kubacki did not give him any order before using force against him. (Doc. 55, p. 28; Doc. 55-3, p. 1.) Additionally, unlike the officer in Brown, Defendant Kubacki did not attempt to put Plaintiff in his cell, but instead brought him to the ground. Consequently, while the need to place inmates in cells is, of course, a legitimate security interest, in this case, the jury could find that Plaintiff did not pose a threat to that interest and that force was not employed to address that interest.

### 5. <u>Any Efforts Taken to Temper the Severity of a Forceful Response</u>

As with the other factors, factual disputes pervade any inquiry into efforts taken to limit the severity of a forceful response. Plaintiff contends that Defendant Kubacki never gave him a verbal directive or employed any other corrective method before employing force. (Doc. 55, p. 28.) It is undisputed that, minutes after the incident, Plaintiff was taken to the medical unit and given an evaluation. However, while waiting on a camera to record the walk to the medical unit and the evaluation, Defendant Kubacki kept Plaintiff pinned facedown on the concrete floor. While Defendant Kubacki claims this was necessary to keep Plaintiff from spitting on officers (doc. 52-6, p. 5), Plaintiff disputes that he attempted to spit on anyone (doc. 55-3, pp. 1–2). Moreover, Plaintiff claims that while waiting on the camera to record the trip to the medical unit, Defendant Kubacki continued to grind Plaintiff's face into the concrete. (Doc. 55-3, p. 2.) Additionally, the escort to the medical unit and other efforts taken to limit the severity of the response were instigated by other officers, and, therefore, the jury could find these acts to not be particularly indicative of whether Defendant Kubacki exercised force maliciously or sadistically.

**6.  Defendant Kubacki's Prior Threats to Do Bodily Harm to Plaintiff**

Finally, Defendant Kubacki's alleged threats to do bodily harm to Plaintiff cut against a grant of summary judgment.  Plaintiff contends that he and Defendant Kubacki had an argument the day before the incident and that, afterwards, Defendant Kubacki "kept threatening" Plaintiff. (Doc. 55-3, p. 1.)  Plaintiff further contends that he complained about these threats to Defendant Hutcheson directly before the incident.  (Id.); see also McReynolds v. Ala. Dep't of Youth Servs., 204 F. App'x 819, 822 (11th Cir. 2006) (reversing dismissal of Eighth Amendment excessive force claims because plaintiff alleged, among other things, that juvenile detainee had previously complained about guard's treatment of detainee and detainee had attempted to make further complaint shortly before use of force); Abascal v. Fleckenstein, No. 06-CV-349S, 2012 WL 638977, at *6 (W.D.N.Y. Feb. 27, 2012) (threat made by officer when combined with absence of provocation provides sufficient evidence to raise a material question of fact to officer's intent in using force).  If the jury were to believe Plaintiff's account that Defendant Kubacki threatened to harm Plaintiff prior to the incident, then that evidence could support a conclusion that Defendant Kubacki applied force "maliciously and sadistically for the very purpose of causing harm" rather than to restore order and discipline.  Whitley, 475 U.S. at 320–21.

For these reasons, the Court should not grant Defendant Kubacki summary judgment on his arguments that he did not use an excessive amount of force against Plaintiff.

**B.     Failure to Intervene Claims Against Defendants Brown and McLeod**

Defendants assert that, even if Defendant Kubacki used an excessive amount of force against Plaintiff, Defendants Brown and McLeod did not have the opportunity to intervene due

to the short duration of the use-of-force incident. (Doc. 52-2, pp. 8–9.)[11] Additionally, Defendant Brown alleges that she did not witness any use of force against Plaintiff. (Id.) Plaintiff states that Defendants Brown and McLeod were deliberately indifferent to his safety because they failed to stop Defendant Kubacki's alleged use of excessive force. (Doc. 1, p. 7.) According to Plaintiff, Defendants Brown and McLeod had a duty to intervene on his behalf and had the opportunity to intervene on his behalf, as they were all standing within a few feet of the incident. (Doc. 55-1, pp. 11–14.)

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]" (alterations in original) (citing Ensley v. Soper, 142 F.3d 1402, 1407–08 (11th Cir. 1998))). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." Id.; see also Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010) (explaining that a direct failure to intervene claim "requir[es] the allegations to include facts showing the necessity or real opportunity for the defendant-officers to intervene in a fellow officer's unlawful conduct"). However, if there is no underlying use of excessive force, another officer has no obligation to intervene. Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009).

Even if the jury concludes that Defendant Kubacki used an excessive amount of force against Plaintiff, no reasonable juror could conclude that Defendants Brown and McLeod were in a position to intervene. The video evidence shows that the period of time from when Defendant Kubacki pushed Plaintiff into the wall to when Plaintiff was on the floor lasted five seconds.

---

[11]  As discussed below, Defendants make these same arguments as to Defendant Hutcheson. However, for the reasons stated below, the Court should address claims against Defendant Hutcheson separately.

(Doc. 52-12, 33:20–25.) The Court notes Plaintiff's assertion that Defendants Brown and McLeod were standing "within feet[ ]" of Plaintiff and Defendant Kubacki. (Doc. 55-1, p. 13.) While this assertion is undisputed by Defendants as well as the videotape, what is also undisputed is the short duration of Defendant Kubacki's use of force. Defendants Brown and McLeod were not in a position to intervene in the alleged use of excessive force and should be entitled to summary judgment in their favor. Cf. Priester, 208 F.3d at 925 (holding two minutes of a dog biting a suspect was long enough for another officer to intervene); see also King v. Reap, 269 F. App'x 857, 860 (11th Cir. 2008) ("Here, King testified that the deputies who arrived on the scene later were there for his arrest and beating; each of the deputies testified that they witnessed the beating. He also alleged that the beating took place for about twenty minutes. Therefore, each Appellant had the opportunity to observe that a handcuffed, non-violent suspect was being beaten but failed to intervene, violating his constitutional rights.").

For these reasons, this portion of Defendants' Motion should be **GRANTED**, and Plaintiff's claims against Defendants Brown and McLeod should be **DISMISSED WITH PREJUDICE**.

### C. Failure to Protect and Intervene Claims Against Defendant Hutcheson

Defendants do not distinguish between the allegations against Defendant Hutcheson and those against Defendants Brown and McLeod. They argue that Defendant Hutcheson, like Defendants Brown and McLeod, did not have the opportunity to intervene in Defendant Kubacki's brief use of force. (Doc. 58, p. 6.) However, Plaintiff's allegations against Defendant Hutcheson differ from those against Defendants Brown and McLeod and, therefore, must be discussed separately.

As described above, Plaintiff alleges that on the date of the incident, he alerted Defendant Hutcheson that Defendant Kubacki had threatened to harm him. (Doc. 1, p. 5.) Plaintiff alleges that he refused to leave the yard in order that he could discuss Defendant Kubacki's threats with Defendant Hutcheson, the officer in charge at the time. (Doc. 55-3, p. 1.) According to Plaintiff, he told Defendant Hutcheson, "Defendant Kubacki keeps threatening me saying he's going to get at me." (Id.) Plaintiff alleges that Defendant Hutcheson responded by asking Plaintiff if he was "snitching." (Id.) Plaintiff states that he told Defendant Hutcheson that Plaintiff and Defendant Kubacki had an argument the day before and that Plaintiff was "trying to defuse the situation." (Id.) Plaintiff maintains that Defendant Kubacki responded, "You coming off the yard or not because either way something going to happen to you." (Id.) Directly thereafter, Plaintiff was handcuffed and escorted to his cell by Defendants Hutcheson, Kubacki, Brown, and McLeod.

The Eighth Amendment's proscription against cruel and unusual punishment not only requires a prison official to intervene in the midst of a constitutional violation under the circumstances set forth above, but also requires that prison officials provide reasonable protection from known risks to an inmate's health and safety. "[A] prison official's failure to act in certain circumstances can amount to an infliction of cruel and unusual punishment. An official's deliberate indifference to a known danger violates an inmate's Eighth Amendment rights." McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995) (citing Estelle v. Gamble, 429 U.S. 97, 104–05 (1976)). More specifically, "[w]hen prison officials become aware of a threat to an inmate's health and safety, the Eighth Amendment's proscription against cruel and unusual punishment imposes a duty upon those officials to provide reasonable protection." Stuckey v. Thompson, No. CV405-216, 2007 WL 1035134, *5 (S.D. Ga. Mar. 29, 2007) (quoting Brown v.

Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990)).[12]  However, "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment[ ] Clause."  McCoy, 47 F.3d at 408 (alteration in original).  Furthermore, "[t]o be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety."  Id. (alteration in original) (quoting Whitley, 475 U.S. at 319).  In other words, "[m]erely negligent failure to protect an inmate from attack does not justify liability under [42 U.S.C.] § 1983." Stuckey, 2007 WL 1035134, at *5 (citing Brown, 894 F.2d at 1537).  "Before the tort can be raised to constitutional stature, the official's conduct must manifest 'conscious or callous indifference to a prisoner's rights.'"  Id. (quoting Zatler v. Wainwright, 802 F.2d 397, 400 (11th Cir. 1986)).  "Prison officials are not . . . [the] guarantors of a prisoner's safety.  Rather, a prison official must be faced with a known risk of injury that rises to the level of a 'strong likelihood rather than a mere possibility' before [the] failure to protect an inmate can be said to constitute deliberate indifference."  Id. (citations omitted) (quoting Brown, 894 F.2d at 1537).

Construing Plaintiff's pro se Complaint and pleadings liberally, Plaintiff has stated a claim for failure to protect and intervene against Defendant Hutcheson.  Plaintiff alleges that he directly told Defendant Hutcheson that Defendant Kubacki had threatened Plaintiff with bodily harm prior to the use of force incident.  (Doc. 1, p. 5.)  Because Defendants have not addressed

---

[12]  Failure to protect precedent often focuses on a threat posted to an inmate by other inmates.  However, the requirement to protect an inmate from a known danger applies equally in the context of a threat posed by a fellow officer.  See, e.g., Forester v. Hodges, No. 4:12-CV-04094-VEH, 2014 WL 3974679, at *9 (N.D. Ala. Aug. 7, 2014) ("[T]he duty of an officer to protect inmates in their care from assault by fellow officers had been clearly established for years." (citing Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir.1993))); Warren v. Vincent, No. CIV.A. 08-250, 2012 WL 566650, at *3 (W.D. Pa. Feb. 21, 2012) (holding that inmate stated Eighth Amendment failure to protect claim against prison officials who, in the face of inmate's repeated complaints of violence by prison guards, allegedly took no action to address his safety concerns).

these specific allegations against Defendant Hutcheson, Plaintiff has not been given the opportunity to respond and state why these specific claims should survive summary judgment. See Burns v. Gadsden State Cmty. Coll., 908 F.2d 1512, 1517 (11th Cir. 1990) (explaining that plaintiffs must be apprised of facts and legal theories on basis of which defendants claim to be entitled to summary judgment and plaintiffs must have an opportunity to respond to same). Consequently, the Court should decline to grant DefendantHutcheson summary judgment on the failure to protect and intervene claims..

Moreover, based on the record before the Court, the jury could find that Defendant Hutcheson acted deliberately indifferent to a known danger to Plaintiff's safety and health. Construing the facts in Plaintiff's favor, Defendant Hutcheson was aware that Defendant Kubacki had kept threating bodily harm to Plaintiff after an argument with Plaintiff the previous day. According to Plaintiff, he informed Defendant Hutcheson that he refused to leave the yard because of those threats. (Doc. 55-3, p. 1.) The jury could find that rather than taking measures to address Defendant Kubacki's threats, Defendant Hutcheson warned Plaintiff against "snitching" and told Plaintiff that something "was going to happen to him" regardless of whether he stayed in the yard. (See id.) Furthermore, Defendant Hutcheson had the opportunity to intervene and protect Plaintiff as he was one of the officers that escorted Plaintiff from the yard and back to his cell. Despite this position, there is no evidence that Defendant Hutcheson took any measures to investigate the alleged threats, keep Plaintiff from Defendant Kubacki, or otherwise address the alleged threats.

Plaintiff's claims that Defendant Hutcheson failed to intervene in and failed to protect Plaintiff from Defendant Kubacki's use of force present questions of fact best resolved by a jury.

Therefore, the Court should not grant Defendant Hutcheson summary judgement on his arguments that he did not violate Plaintiff's Eighth Amendment rights.

## III.    Qualified Immunity

Defendants maintain that they are entitled to qualified immunity from Plaintiff's claims. (Doc. 52-2, pp. 11–13.)  The law governing whether a government official is entitled to qualified immunity is well established in the Eleventh Circuit.  Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).  A government official "must first prove that he was acting within his discretionary authority." Id. at 1234; see also Ray v. Foltz, 370 F.3d 1079, 1081–82 (11th Cir. 2004).  "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994).  Once the government official has shown that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Gonzalez, 325 F.3d at 1234 (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).  The Supreme Court has established a two-part test to determine the applicability of qualified immunity: First, the court must determine whether the plaintiff's allegations, if true, establish a constitutional violation. Hope, 536 U.S. at 736.  If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established."

Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

As laid out in detail above, Plaintiff's allegations, if true, establish constitutional violations against Defendants Kubacki and Hutcheson. Moreover, the rights that Plaintiff alleges these two Defendants violated are clearly established. In the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted) (citing Johnson v. Breeden, 280 F.3d 1308 (11th Cir. 2002)). Likewise, the Eleventh Circuit long ago established that an "officer has a duty to intervene when another officer uses excessive force." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993). "[T]he duty of an officer to protect inmates in their care from assault by fellow officers had been clearly established for years prior to [defendants'] alleged failure to intervene and protect plaintiff on this occasion." Forester v. Hodges, No. 4:12-CV-04094-VEH, 2014 WL 3974679, at *9 (N.D. Ala. Aug. 7, 2014) (citing Post, 7 F.3d at 1560).

The Court is not concluding today that Defendant Kubacki indeed used unjustified force or that Defendant Hutcheson failed to intervene and protect Plaintiff. On the record before the Court, we cannot know. However, if the Court construes the factual disputes in favor of Plaintiff, as it must, then the actions that Defendant Kubacki and Defendant Hutcheon allegedly took were, "in the light of the preexisting law—beyond what the Constitution would allow under the circumstances." Pourmoghani–Esfahani, 625 F.3d at 1317. For these reasons, the Court

should refuse to grant Defendants Kubacki and Hutcheson summary judgment based on qualified immunity.

## IV.    De Miminis Physical Injury Under the Prison Litigation Reform Act ("PLRA")

Defendants contend that Plaintiff cannot seek money damages because he only suffered de miminis physical injuries as a result of Defendant Kubacki's use of force.[13]   The PLRA, in pertinent part, provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."   42 U.S.C. § 1997e(e).   This section of the PLRA requires a damages recovery for mental or emotional injury to be connected to a physical injury. Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312–13 (11th Cir. 2002).   The physical injury must be more than de minimis in order to avoid the application of Section 1997e(e).   Id. at 1313.   However, the Eleventh Circuit has noted that "[t]he meaning of the phrase 'greater than de minimis,' however, is far from clear." Chatham v. Adcock, 334 F. App'x. 281, 284 (11th Cir. 2009).

Defendants emphasize that Plaintiff only received lacerations and bruising as a result of Defendant Kubacki's use of force and that he only needed minor medical treatment.  (Doc. 52-2, p. 7.)   However, as laid out above, Plaintiff disputes this characterization of his injuries and

---

[13]    Defendants also argue that Plaintiff may not seek nominal damages.   (Doc. 52-2, p. 14 n.2.) Defendants maintain that though "the Eleventh Circuit has not expressly resolved this issue," the PLRA also bars nominal damages in cases involving only de minimis physical injuries.  (Id.)   Because there is a dispute of material fact as to whether Plaintiff's injuries were de miminis, the Court need not address this argument in the case at hand.    Additionally, the Court notes that while the ultimate status of nominal damages under the PLRA may be unsettled in the Eleventh Circuit, see, e.g., Williams v. Allen, No. 7:13-CV-86 (HL), 2014 WL 2547804, at *2 (M.D. Ga. June 5, 2014), much of the Circuit's precedent belies Defendants' requested interpretation of the PLRA.   Indeed, the Eleventh Circuit has stated, albeit in an unpublished opinion, "Nominal damages are not precluded by the Act . . . and 'are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove [an] actual injury sufficient to entitle him to compensatory damages.'"  Jackson v. Hill, 569 F. App'x 697, 699 (11th Cir. 2014) (alteration in original) (citation omitted) (quoting Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003)).

states that in addition to the lacerations and initial bruises noted in the medical review, he also suffered lasting effects including swelling in his face and head; bruises throughout his head, face, and shoulders; lasting physical pain; as well as dizziness and vomiting. (Doc. 55-3, p. 3.) Other courts have found that injuries similar to those alleged by Plaintiff to be adequate to recover under the PLRA. See, e.g., Munn v. Toney, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding that plaintiff's allegations of headaches, cramps, nosebleeds, and dizziness, resulting from denial of prescribed blood pressure treatment, survived Section 1997e(e) review); Cotney v. Bowers, No. 2:03-CV-1181-WKW, 2006 WL 2772775, at *7 (M.D. Ala. Sept. 26, 2006) (finding that plaintiff's allegations of bruised ribs after use of force surmounted Section 1997e(e)'s bar, as plaintiff put forth evidence from which a jury could determine that his physical injuries were more than de minimis).

Given the factual disputes regarding the injuries that Plaintiff received from Defendant Kubacki's use of force, the Court should not conclude as a matter of law that Plaintiff's injuries were de minimis. Therefore, the Court should deny Defendants Kubacki and Hutcheson's arguments on this front as well.

## V.     Claims Based on Vicarious or Supervisory Liability

Defendants also argue that to the extent any of Plaintiff's claims seek to hold them liable through vicarious or supervisory liability, those claims must be dismissed. (Doc. 52-2, pp. 9–10.) In Section 1983 actions, liability must be based on something more than a theory of respondeat superior. Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 801 (11th Cir. 1998) (citing Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990)). A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations. Id. at 802

(quoting <u>Brown</u>, 906 F.2d at 671). For instance, "a causal connection" may be established when the supervisor is well aware of a "history of widespread abuse" and fails to correct the alleged violations. <u>Id.</u> (quoting <u>Brown</u>, 906 F.2d at 671). Constitutional deprivations "that constitute widespread abuse sufficient to notify the supervis[or] . . . must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." <u>Id.</u> (quoting <u>Brown</u>, 906 F.2d at 671). Having actual notice of the alleged unconstitutional practices combined with a refusal to investigate or respond comprises such a causal connection.

It does not appear that Plaintiff is seeking to hold any of the Defendants liable through a theory of vicarious liability or respondeat superior. Rather, Plaintiff alleges that Defendants personally participated in the alleged violations of his constitutional rights. Moreover, the Court's above analysis establishes that Plaintiff levies cognizable claims against Defendants Kubacki and Hutcheson without resorting to allegations of supervisor liability. Specifically, as to Defendant Hutcheson, Plaintiff does not merely allege that this Defendant was the officer in charge at the time of the incident, but also alleges that he directly warned Defendant Hutcheson of the threats that Defendant Kubacki had made against Plaintiff and that Defendant Hutcheson failed to intervene.

Because it does not appear that Plaintiff premises his claims against Defendants Kubacki or Hutcheson on supervisory liability, Defendant's Motion on this issue should be **DENIED AS MOOT**.

## VI. Claims for Money Damages Against Defendants in Their Official Capacities

Defendants argue that any claims for monetary damages against them in their official capacities are barred by the Eleventh Amendment. (Doc. 52-2, pp. 10–11.) However, the Court has already dismissed all monetary claims against Defendants in their official capacities.

(Doc. 26, p. 2.) Accordingly, this portion of Defendant's Motion should also be **DENIED AS MOOT**.

## VII. Claims for Injunctive Relief

Defendants also request summary judgment on Plaintiff's claims for injunctive relief. (Doc. 52-2, pp. 14–15.) Specifically, Defendants contend that Plaintiff does not show the denial of a constitutional right and that his requested relief is not narrowly tailored or the least intrusive means to correct any violation. (Id. (citing 18 U.S.C. § 3626(g)).)

As for Defendants' argument that Plaintiff does not show the denial of a constitutional right, the above discussion lays out at length the reasons why summary judgment should not be granted on that issue as to Defendants Kubacki and Hutcheson. Defendants are likely correct that Plaintiff's requested relief—that he be placed at a minimum or medium security level prison—would not be an appropriate injunctive remedy. That requested relief is not likely to be the least intrusive means to address Defendants Kubacki and Hutcheon's alleged violations. However, it would be imprudent to foreclose the Court from providing any injunctive remedy at all should the jury find that Defendants Kubacki and Hutcheson violated Plaintiff's constitutional rights.[14] Consequently, the Court should **DENY** Defendants' Motion for Summary Judgment on Plaintiff's claims for injunctive relief.

---

[14] This continued availability of injunctive relief is particularly important in this case because, as Defendants acknowledge, should the jury find that Defendants Kubacki and Hutcheson violated Plaintiff's constitutional rights but that only de minimis injury resulted, injunctive relief would be a viable remedy. (See Doc. 52-2, p. 13 ("Addressing a First Amendment claim in Al-Amin, the Court said that prisoners 'still retain a reasonably adequate opportunity to seek relief from constitutional violations that do not involve physical injury, because they may still file suits for declaratory and injunctive relief." (quoting Al-Amin v. Smith, 637 F.3d 1192, 1197 (11th Cir. 2011))).)

# CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment (doc. 52) be **GRANTED IN PART** and **DENIED IN PART**.

Defendants' Motion for Summary Judgment as to Defendants Brown and McLeod should be **GRANTED**, and all claims against those Defendants should be **DISMISSED WITH PREJUDICE**.

Defendants' Motion for Summary Judgment as to Defendants Kubacki and Hutcheson should be **DENIED**, and all claims against those Defendants should remain pending. Likewise, as to Defendants Kubacki and Hutcheson, Defendants' Motion for Summary Judgment based on qualified immunity, de miminis physical injury under the PLRA, and claims for injunctive relief should be **DENIED**. Defendants' Motion for Summary Judgment as to claims based on vicarious or supervisory liability and claims for money damages against Defendants in their official capacities should be **DENIED AS MOOT**.

Any party seeking to object to this Report and Recommendation is **ORDERED** to file specific written objections **within fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the undersigned failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions herein. <u>See</u> 28 U.S.C. § 636(b)(1)(C); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. Plaintiff need not reassert any objections already included in his partial objections (doc. 65) as the Court will consider any objections asserted therein that are applicable to this Report and Recommendation. However, Plaintiff may reassert any objections or state any new objections in response to this Report and Recommendation.

Upon receipt of objections meeting the specificity requirement set out above, a District Judge of this Court will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part the findings or recommendations herein. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. The Clerk of Court is **DIRECTED** to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 15th day of July, 2015.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA